**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| DARRYL CHAD CANTRELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:15-00031 |
| | ) | Judge Sharp/Brown |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**To: The Honorable Kevin H. Sharp, Chief United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner, denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(I) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 15) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 26, 2011, alleging a disability onset date of October 31, 2008.[1,2] Plaintiff claimed he was unable to work due to depression, anxiety, mood disorder, blood clotting problems, and obesity. (Doc. 11, p. 165) Plaintiff's application was denied initially

---

[1] References to page numbers in the administrative record (Doc. 11) are to the page numbers that appear in bold in the lower right corner of each page.

[2] The procedural history below is adopted from the jurisdiction and procedural history section of the Administrative Law Judge's (ALJ) decision, except where indicated by a specific docket entry. (Doc. 11, p. 120)

on November 1, 2011, and upon reconsideration on February 13, 2012. Plaintiff requested a hearing before an ALJ on March 6, 2012. A hearing was held in Cookeville on August 2, 2013 before ALJ John Barker. The ALJ entered an unfavorable decision on January 10, 2014, after which plaintiff filed a request with the Appeals Council on February 14, 2014 to review the ALJ's decision. The Appeals Council denied plaintiff's request on April 20, 2015, whereupon the ALJ's decision became the final decision of the Commissioner.

Plaintiff brought this action through counsel on June 6, 2015 (Doc. 1), following which he filed a motion for judgment on the administrative record on October 19, 2015 (Doc. 15). The Commissioner responded on November 16, 2015. (Doc. 17) Plaintiff did not reply. This matter is now properly before the court.

## II. EVIDENCE[3]

### A. Medical Evidence of Record

Plaintiff first presented to Dr. Viswa Durvasula, M.D., Middle Tennessee Psychiatry Group, on December 3, 2009 for "depression, anger, mood swings, irritability, anxiety," and for being "hateful when he talks to people." (Doc. 11, p. 314) Plaintiff represented that he had been "working for a boat company but was laid off," and he was "looking for a job." (Doc. 1, p. 314) Plaintiff's initial mental status examination was as follows:

> Alert and oriented x3.[4] Dysphoric.[5] Affect is congruent. Has no hallucinations or delusions. Has no suicidal or homicidal ideations. Speech is normal. Thinking is organized. Memory is intact. Intelligence average. Fund of knowledge fair. Insight and judgment

---

[3]  The excerpts of the administrative record below are those necessary to respond to plaintiff's motion for judgment on the administrative record. The remainder of the record is incorporated herein by reference.

[4]  x3 – alert and oriented to person, place and time. http://www.neuroexam.com/neuroexam/content.php?p=5.

[5]  Dysphoria – "disquiet; restlessness; malaise." *Dorland's Illustrated Medical Dictionary* 759 (32 ed. 2012).

present.[6]

(Doc. 11, p. 315)

Plaintiff represented to Dr. Durvasula on January 5, 2010 that he was "feeling some better . . . Medications are helping. No side effects from medications . . . he still gets irritable, frustrated and anxious, [but] his mood swings are better than before." (Doc. 11, p. 313) Dr. Durvasula assessed plaintiff's mood as "[a]nxious," with "[n]o acute stressors." (Doc. 11, p. 313) Plaintiff reported on January 29, 2010 that "he is doing some better . . . denies any side effects from medications. . . . Medications are helping. He is still looking for a job. Reports his family also thinks he is doing better." (Doc. 11, p. 312) Dr. Durvasula noted in the mental assessment that plaintiff "[d]enies depression or anxiety." (Doc. 11, p. 312) Plaintiff reported on March 26, 2010 that "he is doing okay. He still gets angry at times, but doing much better than before. Denies any side effects from medications. . . ." (Doc. 11, p. 311) Dr. Durvasula assessed plaintiff mood as "[a]nxious" with "[n]o acute stressors." (Doc. 11, p. 311) Dr. Durvasula noted on June 24, 2010 that plaintiff "says he is doing good. Taking medications as prescribed. No side effects from medications. . . . He is working on cars and business is going good. . . . Denies any other problems." (Doc. 11, p. 310) Plaintiff's mood was assessed as "[a]nxious." (Doc. 11, p. 310) Dr. Durvasula reported on September 23, 2010 that plaintiff "had [blood] clots in his lung[7] . . . . He is on Coumadin . . . and says he doing okay. . . . Works on cars. Otherwise he is not able to work . . . ." (Doc. 11, p. 309) Plaintiff's mood was assessed as "[a]nxious." (Doc. 11, p. 309)

Plaintiff reported to Dr. Durvasula on January 14, 2011 that "he is doing okay," but his wife

---

6   Although Dr. Durvasula's assessment of plaintiff's <u>mood</u> varies throughout her clinical notes, the remainder of the mental status assessments remains the same.

7   As discussed below, plaintiff had two pulmonary embolisms during the relevant period.

3

who was present reported that he was "having a lot of mood swings . . . [h]e . . . is nervous around people and gets anxious . . . They are also stressed with finances and not having any insurance." (Doc. 11, p. 308) Plaintiff's mood was assessed as "[a]nxious." (Doc. 11, p. 308) Plaintiff reported on February 11, 2011 that he "is doing quite well. . . . Denies any side effects from medication." Plaintiff's wife reported that "he is not [*sic*] doing very well.[8] They have not been arguing and [are] pleased with the way patient is functioning." (Doc. 11, p. 307) Dr. Durvasula assessed plaintiff's mood and effect as "much better." (Doc. 11, p. 307) Plaintiff reported on May 9, 2011 that, apart from not being "motivated and feel[ing] tired," "he says he is doing good. . . [but] . . . [s]ometimes taking care of baby makes him anxious." (Doc. 11, p. 306) Dr. Durvasula assessed plaintiff's mood as "[a]nxious but stable," noting the he "[d]enies any acute stressors." (Doc. 11, p. 306) Plaintiff represented on August 6, 2011 that he "is not doing good, he had blood clots in his lungs again[9] . . . tried to go to work . . . a couple of days, but couldn't function . . . got anxious, overwhelmed, came home shaking and [was] unable to go to work again.[10] He is stressed, anxious, and overwhelmed with everything . . . ." (Doc. 11, p. 455) Plaintiff's mood was assessed as depressed and anxious. (Doc. 11, p. 455) Dr. Durvasula noted on September 16, 2011 that plaintiff represented that he was "doing some better. . . . Denies any side effects from his medications . . . Stressed with finances and his inability to work and lack of insurance." (Doc. 11, p. 587) Dr. Durvasula assessed plaintiff's mood as "[a]nxious but doing better than before." (Doc. 11, p. 587)

---

[8] A plain reading of Dr. Durvasula's February 11, 2011 clinical note reveals that the word "not" in the sentence, "Wife reports he is not doing very well," is a typographical error.

[9] The record shows that plaintiff was admitted to the Cookeville Regional Medical Center on July 25, 2011 for recurrent pulmonary embolism. (Doc. 11, pp. 318-54)

[10] The record shows that plaintiff had been working on cars and welding from approximately June 2010 to August 2011, a period of more than a year. This period of employment was ongoing well after the initial disability onset date, and at about the same time his claims for benefits were denied on initial review.

Plaintiff represented on December 3, 2011 that "he is depressed . . . . No side effects from medications. . . . Turned down for social security. Worried about future and health problems" (Doc. 11, p. 588) Plaintiff's mood was assessed as depressed and anxious. (Doc. 11, p. 588)

On February 27, 2012, Dr. Durvasula assessed plaintiff's mood as "[a]nxious but stable," noting that he "has large anxiety. He doesn't want to pick up his phone or get out of the house and frequently has panic like symptoms." (Doc. 11, p. 640) On June 1, 2012, plaintiff reported being "depressed . . . doesn't have much energy and feels anxious . . . doesn't get out of the house much because of anxiety . . . even to go to church makes him anxious . . . . Other than health and finances, he denies acute stressors." (Doc. 11, p. 641) Plaintiff's mood was assessed as depressed and anxious, but "denie[d] acute stressors." (Doc. 11, p. 641) Plaintiff reported on August 27, 2012 that "he is doing about the same. He has good days and bad days. . . . He says some days he feels okay; other days, he is depressed and does not have any energy or motivation and does not want to get out of bed . . . . He denies any acute stressors other than health problems and finances." (Doc. 11, p. 698) Plaintiff's mood was assessed as "[d]epressed and anxious, but stable." (Doc. 11, p. 698) Dr. Durvasula reported on November 26, 2012 that plaintiff was "stressed and anxious. He says his medications are working okay, but some days he does not want to do anything and worries about the future . . . . Other than his health, he denies any acute stressors. . . . No side effects from medications." (Doc. 11, p. 749) Plaintiff's mood was assessed as "[d]epressed and anxious, but stable." (Doc. 11, p. 749)

Dr. Durvasula completed a medical source statement (MSS) on December 3, 2012. (Doc. 11, pp. 708-10) Dr. Durvasula reported that plaintiff had: 1) slight limitations in his ability to understand and remember short, simple instructions, and make judgments on simple work-related decisions; 2) moderate limitations in his ability to carry out short, simple instructions, and interact

appropriately with the public and coworkers; 3) marked limitations in his ability to understand, remember, and carry out detailed instructions, interact appropriately with supervisors, and respond appropriately to work pressures and changes in a usual/routine work setting. (Doc. 11, pp. 708-09) Dr. Durvasula also concluded that plaintiff would miss an average of more than 3 days of work per month due to his conditions/symptoms. (Doc. 11, p. 710)

Dr. Durvasula next treated plaintiff on February 25, 2013. (Doc. 11, p. 750) Dr. Durvasula described plaintiff as "stressed, anxious and depressed . . . worries about [the] future and his health problems. . . . He has not been able to work and everything is overwhelming him and making him depressed." (Doc. 11, p. 750) Plaintiff represented that he "always had trouble concentrating, focusing, and remembering things . . . ." (Doc. 11, p. 750) Plaintiff's mood was assessed as "[d]epressed, anxious." (Doc. 11, p. 750) On May 15, 2013, Plaintiff described himself as "doing about the same. He has good days and bad days. Medications are working okay. No side effects from medications. . . . He is worried about health problems. He is stressed with finances and worried about [the] future. He is expecting another baby . . . [and] . . . is happy and anxious about it." (Doc. 11, p. 751) Dr. Durvasula described plaintiff's mood as "[a]nxious, but stable." (Doc. 11, p. 751)[11]

Plaintiff presented to Dr. James Cates, M.D., Satellite Med, on August 7, 2010 for "pleurisy." (Doc. 11, pp. 382-83) Dr. Cates noted that plaintiff was "depressed," and that he "appear[ed] concerned about current symptoms." (Doc. 11, pp. 382-83) Plaintiff presented to Dr. Cates on

August 9, 2010 with a complaint of worsening chest pain. (Doc. 11, pp. 387-89) Dr. Cates

---

[11] There are medical records before the court that were not before the ALJ at the time he entered his decision. (Doc. 11, pp. 1-113, 140, Ex. 40F-42F, pp. 797-821) The court may not consider these records because they were not before the ALJ at the time he entered his decision. *See e.g., Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993); *Pompa v. Commissioner of Social Sec.*, 73 Fed.Appx. 801, 804 (6th Cir. 2003)(citing *Cotton*).

reported that plaintiff exhibited "mild anxiety." (Doc. 11, p. 389)

Dr. Douglas Kane, M.D., Highland Rim Respiratory Specialists, saw plaintiff on August 12, 2010 on referral from Dr. Cates following "left-sided chest pain . . . ." (Doc. 11, pp. 486-87) Dr. Kane noted that plaintiff "is a relatively active individual and works on cars during the day . . . [and] . . . does . . . some welding." (Doc. 11, p. 486) Thereafter, Dr. Cates reported on August 16 and 26, September 21, November 30, and December 8, 2010 that plaintiff exhibited "no depression, anxiety, or agitation" (Doc. 11, pp. 395, 403, 411, 417, 421), with plaintiff specifically "[d]enyi[ng] depression, anxiety" on November 30 and December 8, 2010 (Doc. 11, pp. 416, 420).

Dr. Cates's assessment on September 15, 2011 was that plaintiff was in a "depressed mood" (Doc. 11, p. 566), but on October 13, 2011, he exhibited "no depression, anxiety, or agitation" (Doc. 11, p. 576). Dr. Cates assessed plaintiff's mood and affect as "depressed . . . but not suicidal" on January 11, 2012 (Doc. 11, p. 606), as "anxious" on August 23, 2012 (Doc. 11, p. 743), and as "depressed" on November 21, 2012 (Doc. 11, p. 747). On January 29, 2013, Dr. Cates assessed plaintiff's mood and affect as "anxiety improved with continued depression" (Doc. 11, p. 766), and on June 3, July 17 and 22, 2013 as "depressed" (Doc. 11, pp. 771, 775, 778).

Dr. Kane treated plaintiff again on September 27, 2011. (Doc. 11, p. 485) Dr. Kane noted that plaintiff informed him that he "had spent a couple of weeks at a time . . . in bed with his severe depression" at the time of his first pulmonary embolism, that he "took to the bed for another couple of weeks" prior to his second pulmonary embolism. (Doc. 11, p. 485) Dr. Kane also noted that plaintiff "will follow up with Dr. Durvasula concerning his depression. Hopefully she can help him make some progress with this serious issue." (Doc. 11, p. 485)

On January 10, 2012, Dr. Kane reported that plaintiff had a second incident with a "minor pulmonary embolism." (Doc. 11, p. 589) Dr. Kane's impression was that plaintiff had a

"[b]orderline mild obstructive lung disease," and "reassured him that his questionable and minimal pulmonary embolism has had absolutely no effect on his lung function . . . ." (Doc. 11, p. 589) Dr. Kane also noted that plaintiff had "severe depression to the point that he is extremely inactive . . . ." (Doc. 11, p. 589)

Jerell Killian, MS, Senior Psychological Examiner, examined plaintiff consultively on October 12, 2011. (Doc. 11, pp. 560-63) Mr. Killian noted initially that plaintiff "arrived as scheduled," and that "[n]o other sources of information were available" apart from plaintiff's "detailed, sequential history." (Doc. 11, p. 560) Mr. Killian's report is quoted below in relevant part, beginning with "Signs and Symptoms."

> [Plaintiff] stated he has . . . crying spells, nausea, dizziness, feelings of hopelessness and helplessness, irritability, increased sleep, difficulty concentrating, and 'a little shortness of breath'.
>
> . . .
>
> He exhibited no signs of significant distress during this session. He was friendly, polite, and spontaneous. He engaged normally in conversation. There were no psychomotor abnormalities such as tremor, agitation, or slowed responses. Variations in affect were normal. . . .

(Doc. 11, p. 561) The results of plaintiff's mental status examination were as follows:

> The mental status examination revealed an alert, well oriented individual. . . .
>
> . . .
>
> There were no blocked or interrupted thoughts. . . . and he made calculations involving compound functions. He exhibited adequate awareness . . . and he provided reasonable responses to judgment questions. He spelled world backwards, and he was able to recall after approximately forty-five minutes all four items which I had asked him to record on a sheet of paper.

(Doc. 11, pp. 561-62) Mr. Killian reported the following limitations in activities of daily living

(ADLs):

> He does not like to go out because of the anxiety when he has to interact with others but he and his wife go grocery shopping together. He has weekly contacts with close friends and relatives. He stated they usually watch a movie together. He has a valid driver's license and drove himself and his wife to this appointment today. . . .

(Doc. 11, p. 562)  Mr. Killian's functional assessment included the following:

> Information provided by Mr. Cantrell and his presentation during this session lead me to believe he is suffering from significant mood problems. He primarily described symptoms of depression but also anxiety with some unusual symptoms. He stated he has times when he can't concentrate because of racing thoughts but he demonstrated more than adequate reasoning, memory, and concentration during this session. Interaction with others seems to be moderately impacted by his difficulties. . . .  Adaptability may be the major obstacle for employment as he described difficulty coping with change and other forms of stress.

(Doc. 11, p. 562)

Dr. Roy Bilbrey, Ph.D., examined plaintiff consultively on September 17, 2012 at plaintiff's request. (Doc. 11, pp. 699-707)  Dr. Bilbrey noted initially that plaintiff "completed the office form without assistance . . . appeared to be an adequate historian . . . [and] . . . cooperated well with the evaluation process."  (Doc. 11, p. 699)  Dr. Bilbrey reported the following pursuant to plaintiff's mental status assessment:

> Mr. Cantrell was alert and oriented in all spheres. His speech was spontaneous, and he was relevant and coherent. . . . He describes his mood as 'depressed,' and he states that he becomes highly anxious when around other people. His affect was somewhat dysphoric. . . . His immediate memory is adequate . . . . His memory for recent events is good . . . . His memory for remote events appears to be good . . . . Mr. Cantrell did not appear to have any difficulty concentrating . . . . His judgment and reasoning abilities appear to be adequate for determining appropriate thoughts and actions in various situations. Mr. Cantrell is capable of thinking in abstract terms, and his level of intellectual functioning is estimated to be in the Average range. His stream of thought is adequate . . . .

(Doc. 11, p. 700)  Dr. Bilbrey described plaintiff's ADLs as follows:

> Mr. Cantrell . . . drives to his mother's or his grandmother's . . . .  He says he . . . goes with his wife grocery shopping. . . .  Mr. Cantrell states that he occasionally visits a friend, and he talks to friends on the telephone.  He says he occasionally eats in restaurants.
>
> Mr. Cantrell . . . had no difficulty concentrating.

(Doc. 11, p. 701)  Dr. Bilbrey opined that plaintiff was "capable of relating to others and interacting and communicating effectively with them if . . . not in a crowd of people."  (Doc. 11, p. 701)

In his supporting MSS, Dr. Bilbrey noted the following limitations in plaintiff's mental abilities and aptitude to do unskilled work: 1) moderate limitations in his ability to maintain regular attendance, to be punctual, and perform at a constant pace without an unreasonable number and length of rest periods; 2) marked limitations to complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, and deal with normal work stress.  (Doc. 11, p. 704)  Plaintiff exhibited slight limitations in the other areas of mental ability and aptitude to perform unskilled work.  (Doc. 11, p. 704)  Dr. Bilbrey also determined that, although plaintiff had slight limitations in his ability to set realistic goals and/or make plans independently in the semi-skilled and skilled work environment, he had marked limitations in his ability to understand, remember and carry out detailed instructions, and deal with the stress of semiskilled and skilled work.  (Doc. 11, p. 705)  Dr. Bilbrey also determined that plaintiff had marked limitations in his ability to interact with the general public, but only slight limitations in his ability to maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation.  (Doc. 11, p. 706)  Finally, Dr. Bilbrey determined that plaintiff would be absent from work about three times per month due to his alleged impairments.  (Doc. 11, p. 707)

Senior Psychological Examiner Jeffery Herman examined plaintiff consultively on

September 12, 2013.[12]  (Doc. 11, pp. 782-91)  Mr. Herman's report is quoted below in relevant part.

As to plaintiff's ADLs, Mr. Herman wrote:

> The client reports that . . . he goes to see his mom about four times a
> week and visits his grandmother one to two times to week. . . .
>
> . . . . Asked if he has good days or if they are all about the same, he
> reports 'somewhere [*sic*] a little better.'  He describes a better day as
> 'I feel a little better.'  He describes a bad as feeling 'sick and away.'

(Doc. 11, p. 784)

The results of Mr. Herman's mental status examination included the following:

> Mr. Cantrell was . . . oriented to location.  He was oriented to season.
> He was oriented to person and purpose.  He was able to . . . recall a
> recent news story . . . .  He was able to recall the president of the
> United States and his predecessor.
>
> Mr. Cantrell was able to recall three objects immediately after
> presentation.  He was able to spell world forward.  Asked to spell it
> backwards, he gave the series 'd-1-o-r-d.'  He was able to recall all
> three previously presented objects.  He is capable of registering and
> retrieving memories.
>
> Asked to count backwards from 100 by 3's, Mr. Cantrell performed
> the first five operations without error.  Asked to count backwards
> from 100 by 7's, he made two errors on the first seven operations.
> However, he was able to solve the problem 'candy bars cost 25 cents
> each.  How much would it cost to buy six?'  He was not able to solve
> the problem 'if you have 20 dollars and spend 7 dollars and 50 cents,
> how much will you have left?'
>
> . . .
>
> . . . .  He was able to identify reasonable course of action to finding
> a lost letter in the street . . . .  This indicates that judgment is intact.
> Asked the meaning of 'don't count your chickens before they are
> hatched,' he replied 'he didn't know.'  The examiner prompted him to
> try.  He replied, 'you don't know what you have put there.'  He was

---

[12] Mr. Herman's examination was ordered by the ALJ at the conclusion of the evidentiary hearing.  (Doc. 11,
p. 155)

able to recognize the abstract nature and underlying meaning of the proverb, indicating that abstract reasoning is intact.

. . .

Mr. Cantrell's speech is totally normal in terms of pitch, rate, and volume. Vocabulary and syntax are well developed. Mr. Cantrell overall appeared in no acute distress. There were no evident signs of anxiety or depression. . . . Overall, presentation was unremarkable.

(Doc. 11, pp. 784-85)

Mr. Herman's summary and conclusions were as follows:

Mr. Cantrell is capable of understanding and remembering instructions of a simple or detailed nature. His ability to understand complex directions is questionable.

The client was able to sustain reasonable concentration and persistence during the assessment. He did have some difficulty with concentration, but this would not interfere with his ability to perform simple or detailed tasks. The examiner does not see the concentration difficulty as a limiting factor.

The client reports severe anxiety in the presence of others. This was not observed by the examiner. The client's presentation was entirely within normal limits. Speech is normal in all regards. He spoke freely with the examiner and did not appear in any acute distress. He appears capable of interacting with coworkers, supervisors, and the general public as needed. He appears to have restricted his activities beyond what is necessary given the examiner's observations.

. . . . He could be aware of common hazards and takes reasonable precautions. He is able to mentally adjust to changes in the work setting. He is capable of setting goals for himself, although he does appear to rely heavily on others for this purpose.

(Doc. 11, pp. 786-77)

Mr. Herman filed a MSS pertaining to plaintiff's mental ability to do work-related activities.

(Doc. 11, pp. 788-91) Mr. Herman assessed plaintiff with no limitations in his ability to understand, remember, and carry out simple instructions, or to make judgments on simple work-related

decisions, but it was questionable in Mr. Herman's opinion whether plaintiff could do the same with respect to complex instructions and work-decisions. (Doc. 11, p. 788) Mr. Herman concluded that plaintiff had no limitations in his ability to interact appropriately with supervisors, coworkers, and the general public, and that his impairments would not make him unable to respond to changes in a routine work setting. (Doc. 11, p. 790)

## B. Transcript of the Hearing

The ALJ adduced the following relevant testimony from plaintiff at the August 2, 3013 hearing in Cookeville:

Q        Have you worked since October 31, 2008?

A        I don't believe so, no. I believe that date's correct.[13]

(Doc. 11, p. 144)

Counsel adduced the following additional testimony from plaintiff:

Q        Do you have any difficulty with crying?

A        Yes, I have crying spells and I couldn't tell you why or the reason why I would be crying.

Q        How often does that seem to happen?

A        Sometimes it could go a couple weeks without one or it could be two times a week.

Q        Now, are there any things that you find yourself afraid of?

A        As I mentioned before, drive thru windows and it sounds crazy, the end of the world worries me and buildings with multi-levels.

(Doc. 11, pp. 149-50)

Q        Do you drive?

---

13   As noted above at p.4  n. 10, was working well after the date to which he testified.

A       Yes.

Q       How often do you drive?

A       Mostly just to relative's house.

Q       And is that on a daily basis, then?

A       Except for weekends, yes.

                        . . .

Q       Do you have friends who come to visit?

A       I do have one friend, yeah.

Q       And how often would you let him [*sic*]?

A       Probably average once a week.

Q       And what kinds of things do you do with that friend?

A       Talk, and maybe watch a movie, nothing really anything you would do outside the home.

Q       . . . .  Are you able to go to the grocery store?

A       I am, but it's a lot better if my wife's with me.

                        . . .

Q       And when you go to the store, do you go by yourself at times?

A       To pick up medication, I do.

                        . . .

Q       Do you have any difficulty with your concentration?

A       A lot, yes.

Q       And when do you find that happening?

A       Maybe multitasking, I am limited to one thing at a time, basically, and my memory's just gone downhill.

Q      And when you say your memory's gone . . . is it a problem with long term memory, or remembering something happening in the past, or remembering something happening yesterday?

A      Mostly, the past. . . .

(Doc. 11, pp. 152-54)

## IV.  ANALYSIS

### A.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014).  While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile.  *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

### B.  Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards.  42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374.  Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708,

722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

### C. Claims of Error

### 1. Whether the ALJ Erred in Giving Too Little
### Weight to Dr. Durvasula's MSS
### (Doc. 16, pp. 18-23)

Plaintiff asserts the following in support of his first claim of error: 1) "Dr. Durvasula's opinion is sufficiently supported by medical findings" (Doc. 16, pp. 19-20); 2) "Dr. Durvasula's opinion is supported by other treating and consulting providers" (Doc. 16, pp. 20-21); 3) "Dr. Durvasula's assessment is consistent with . . . [plaintiff's] hearing testimony" (Doc. 16, pp. 21-23).

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques,'" and the opinion "'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). The ALJ "is not bound by a treating source's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip v. Sec'y of Health and Human Serv's*, 25 F.3d 284, 287 (6th Cir. 1994). That said, the ALJ is required to provide "good reasons" for discounting the weight given to a treating-source's opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

The first question is whether the ALJ gave good reasons for not giving Dr. Durvasula's MSS controlling weight. The AL's reasoning is quoted below in its entirety:

The claimant's treatment provider, Viswa Durvasula, M.D., provided a medical source statement of ability to do work-related activities (mental) dated December 2012. Dr. Durvasula stated that the claimant has depression, anxiety, mood swings, and trouble concentrating, remembering, and completing tasks. Dr. Durvasula opined that the claimant has marked limitations in his ability to understand and remember detailed instructions and to carry out detailed instructions. He could also have marked limitations in the area of interacting with supervisors, responding to work pressures appropriately, and responding to changes in a routine work setting appropriately. He would have moderate limitations interacting with the public and coworkers, and moderate limitations carrying out short, simple instructions. . . .

On two separate psychological examinations, as well as in his independent psychological examination, the claimant performed fairly well on his mental status examination. He essentially had very few problems reported relating to his ability to concentrate, converse, remember short-term memories, recall media events, recall items after delays, etc. Even when he did not do well on some abstract questions, he was asked to try again and performed fine on them. He spends his days watching television and getting on the Internet. The suggestion by the claimant's treatment providers, including Dr. Durvasula, that the claimant has marked limitations in his ability to understand and carry out detailed instructions is not consistent with these findings on multiple examinations.

Furthermore, the claimant reported that he has regular daily contact with his family which requires him to leave his home, he goes shopping and to restaurants with his wife, and he also is in regular phone contact with his friends. Despite these reports at more than one source in the medical evidence of record, the claimant would have us believe that he is so limited that he fears leaving his home, that he isolates, and that he avoids others. The claimant's own self-reports of limitations do not appear to be supported by or even to explain his lifestyle that involves frequent interaction with others. Therefore, Dr. Durvasula's opinion is given little weight.

(Doc. 11, pp. 129-30) The ALJ's reason quoted above constitutes "good reason." The next question

is whether the ALJ's reason is supported by substantial evidence.

Plaintiff's first argument is that Dr. Durvasula's opinion is sufficiently supported by medical

findings. Dr. Durvasula's opinion regarding plaintiff's alleged "marked" limitations in his ability to understand, remember, and carry out detailed instructions,[14] and moderate limitations in his ability to carry out short, simple instructions, is not supported by her own clinical notes. Dr. Durvasula reported on each and every occasion she treated plaintiff that he was oriented x3, his speech normal, thinking organized, memory intact, intelligence average, fund of knowledge fair, and both insight and judgement present. These psychological/mental characteristics, and the fact that plaintiff worked as mechanic and welder during his alleged period of disability, show that plaintiff was able – at the very least – to understand, remember, and carry out simple, non-detailed instructions.

The ALJ's decision pertaining to plaintiff's ability to understand, remember, and carry out simple instructions also is supported by other substantial evidence on the record. More particularly, the record shows that Dr. Durvasula reported in her June 24, 2010 clinical note that plaintiff "says he is doing good. . . . He is working on cars and business is good. . . . Denies any other problems." On August 12, 2010, Dr. Kane noted on August 12, 2010 that plaintiff "is relatively active and works on cars during the day . . . [and] . . . does some welding," thereby corroborating that plaintiff was working during this time frame. The following year, on August 6, 2011, Dr. Durvasula reported that plaintiff "had blood clots in his lungs again . . . tried to go to work a couple of days, but couldn't function . . . . and [was] unable to go to work again," the inference being that plaintiff had been working for at least a year before his second pulmonary embolism.

Although it cannot be determined for whom plaintiff worked during the one-plus year period described above, it is apparent from the statement "business is good" that plaintiff was working for someone, *e.g.*, a manager/supervisor, and/or directly for individual clients. In either case, it follows

---

[14] Plaintiff argues, *inter alia*, that he has marked limitations in his ability to carry out detailed instructions. However, the ALJ's RFC assessment provides that plaintiff is able to perform "simple, non-detailed tasks," not detailed instructions/tasks. (Doc. 11, p. 124)

that, if plaintiff were working on cars and welding for someone else, regardless of who that someone else might have been, then he was able – at the very least – to understand, remember, and carry out simple, non-detailed instructions associated with such work.[15]

The ALJ's decision as to plaintiff's ability to understand, remember, and carry out simple, non-detailed instructions also is supported by the reports of Messrs. Killian and Herman, and Dr. Bilbrey, all of whom examined plaintiff. Mr. Killian reported that plaintiff was an "alert, well oriented individual" with "no blocked or interrupted thoughts," and that he "demonstrated more than adequate reasoning, memory, and concentration. . . ." Mr. Herman reported that plaintiff was "capable of understanding and remembering instructions of a simple or detained nature" and that, although "[h]e did have some difficulty with concentration . . . this would not interfere with his ability to perform simple or detailed tasks." Dr. Bilbrey reported that plaintiff's "immediate memory is adequate . . . [h]is memory for recent events is good . . . [h]is memory for remote events appears to be good . . . [he] did not appear to have any difficulty concentrating . . . [h]is judgment and reasoning abilities appear to be adequate for determining appropriate thoughts and actions in various situations . . . [he] is capable of thinking in abstract terms . . . his intellectual functioning is estimated to be in the Average range . . . [h]is stream of thought is adequate . . . ."[16]

Although the ALJ did not refer to it in his decision, Dr. S. Jessee, M.D., completed a mental RFC assessment on September 29, 2011. (Doc. 11, pp. 502-04) Dr. Jessee determined that plaintiff had moderate – not marked – limitations in his ability to understand, remember, and carry out detailed instructions, and no significant limitations in his ability to understand, remember, and carry

---

[15] It is important to recall that plaintiff's testimony under oath that he last worked in 2008 is inconsistent with his later work history reflected in the record.

[16] As discussed herein at pp. 9-11, 23-24, although the ALJ gave Dr. Bilbrey's conclusions little weight, he did so only because Dr. Bilbrey's conclusions were inconsistent with his observations during the examination.

out simple instructions.  (Doc. 11, p. 502)

Dr. Durvasula opinion that plaintiff had marked limitations in his ability to interact appropriately with supervisors, and to respond to work pressures and changes in a usual work setting also is not supported by the record.  Dr. Durvasula's clinical notes pertaining to these alleged social interaction and adaptability limitations can be divided into three periods: the first from December 3, 2009 when plaintiff first presented to Dr. Durvasula for treatment until August 6, 2011 when he reported his second pulmonary embolism, the second from August 6, 2011 to November 26, 2012, the period between plaintiff's second embolism and Dr. Durvasula's MSS, and the third from February 25 to May 15, 2013, the period following Dr. Durvasula's MSS.

As discussed above at pp. 3-4 and n. 10, plaintiff worked during the first period from at least June 2010 to August 2011 with all the social interaction, work pressure, and adaptability implications related to employment as a mechanic and welder.   That plaintiff worked for more than a year as a mechanic and welder – for <u>someone</u> – contravenes Dr. Durvasula's opinion that plaintiff was unable to work during the first period due to social interaction and adaptability limitations.

In addition to the foregoing, Dr. Durvasula reported throughout the first period that plaintiff's medications were working, and that they were having no side effects, the inference being that plaintiff's conditions/symptoms were controlled by medication.  This inference is supported by Dr. Durvasula's clinical notes which show that plaintiff's condition/symptoms improved from December 3, 2009 to June 24, 2010 when, on June 24 just prior to his first pulmonary embolism, he reported that he was "doing good . . . working on cars . . . business is going good . . . and [denie[d] any other problems."   Shortly thereafter, plaintiff reported his first pulmonary embolism to Dr. Durvasula on September 23, 2010, noting at the same time that he was "doing okay," and that he still was working on cars.  Thereafter, from January 14 to May 9, 2011, plaintiff consistently reported

that he was "doing okay," "doing quite well," doing "much better," "doing good," until on August 6, 2011 he reported that "he had blood clots in his lungs again . . . tried to go to work . . . but couldn't function . . . and [was] unable to go to work again. . . ." In short, Dr. Durvasula's clinical notes show that plaintiff was working when he claimed he was unable to, and that his alleged conditions/symptoms during the first period did not "last for a continuous period of not less than 12 months" as required under the regulations.

Turning to the second period, although plaintiff reported shortly after his second pulmonary embolism that he had did not want to "get out of the house and frequently ha[d] panic like symptoms," and that he did not "get out of the house . . . because of anxiety . . . . even to go church. . . . ," each and every clinical note thereafter couches plaintiff's anxiety/depression in terms of "finances and not having insurance," "finances and his inability to work and lack of insurance," being "[t]urned down for social security," concerns for his "future and health problems," "health and finances," "health problems and finances," his "health." The conditions/symptoms recorded in these clinical notes do not translate into workplace social interaction and adaptability limitations.

The ALJ's decision to accord little weight to Dr. Durvasula's opinion that plaintiff had marked social interaction and adaptability issues once again is supported by other evidence on the record. Mr. Killian reported that "Interaction with others seems to be moderately impacted by his difficulties," not markedly affected. Mr. Herman reported that plaintiff expressed "severe anxiety in the presence of others . . . [but] . . . [t]his was not observed by the examiner. . . . He appears capable of interacting with coworkers, supervisors, and the general public as needed. . . . He is able to mentally adjust to changes in the work setting." Dr. Bilbrey opined that "Mr. Caldwell is capable of relating to others and interacting and communicating effectively with them if he is not in a crowd of people." Dr. Jessee noted, in turn, that "[c]laimant can accept supervision and interact with

21

coworkers," adding that "contact with the publ[ic] [sh]ould be limited," and that he "would work best in an environment with low demand for social interaction."

Finally there is the third period, discussed above at p. 6. The two records in this 2-plus month period reveal plaintiff's continued concern about his inability to work due to physical health problems, finances, his concern for the future, and the fact that he and his wife were expecting another baby. Once again, although the records capture plaintiff's psychological/mental state, they do not do so in the context of plaintiff's ability to interact with supervisors, respond to work pressures, and/or respond to changes in the work setting.

The ALJ's decision to accord little weight to Dr. Durvasula's opinion that plaintiff had marked social interaction and adaptability issues once again is supported by other evidence on the record. Mr. Killian reported that "Interaction with others seems to be moderately impacted by his difficulties." Mr. Herman reported that plaintiff expressed "severe anxiety in the presence of others . . . [but] . . . [t]his was not observed by the examiner. . . . He appears capable of interacting with coworkers, supervisors, and the general public as needed. . . . He is able to mentally adjust to changes in the work setting." Dr. Bilbrey opined that "Mr. Caldwell is capable of relating to others and interacting and communicating effectively with them if he is not in a crowd of people." Dr. Jessee noted, in turn, that "[c]laimant can accept supervision and interact with coworkers," adding that "contact with the publ[ic] [sh]ould be limited," and that he "would work best in an environment with low demand for social interaction."

Plaintiff's second argument is that "Dr. Durvasula's opinion is supported by other treating and consulting provides." *i.e.*, the opinions of Drs. Cates, Kane, Bilbrey, and Jessee. This argument also is not supported by the record.

Dr. Cates' August 7 and 9, 2010 assessments of plaintiff's moods stemmed from plaintiff's

22

physical health problems, not any alleged behavioral disorders.  Indeed, in the five following visits between August 16 and December 8, 2010, plaintiff exhibited "no depression, anxiety, or agitation, and on November 30 and December 8, 2010, he specifically denied depression or anxiety.  Dr. Cates' clinical notes from September 15, 2011 to November 6, 2013 all followed plaintiff's second pulmonary embolism, and all pertained to related follow-up examinations pertaining to previous physical health problems.  Dr. Cates' mental assessments during this period do not pertain to plaintiff's alleged inability to work due to depression, anxiety, mood disorder resulting from being around others – they once again pertain to his state of mind arising from physical health problems.

Dr. Kane's records also do not support Dr. Durvasula's opinion.  Dr. Kane makes no reference to plaintiff's alleged mental/psychological condition in August 12, 2010 report to Dr. Cates.  In his September 27, 2011 report to Dr. Cates, Dr. Kane merely repeats plaintiff's recollection that he was in bed due to depression in each instance before the pulmonary embolisms, not that Dr. Kane actually observed/assessed any psychological problems.  Dr. Kane's observation on January 10, 2012 that plaintiff had "severe depression to the point that he is extremely inactive" once again was based on plaintiff's representation to Dr. Kane, not Dr. Kane's observation upon examination.

As previously noted, the ALJ gave Dr. Bilbrey opinion little weight.  The ALJ's reasons are quoted below in relevant part:

> The undersigned notes that it is entirely inconsistent for the independent examiner to opine that the claimant can interact and communicate effectively with others and that he has moderate levels of mental functioning, yet would find multiple areas of marked limitations including peculiarly in the area of being able to remember and carry out detailed instructions effectively despite performing quite well on his mental status examination.  The independent examiner also opined that the claimant has moderate limitations in maintaining regular attendance and performing at a consistent pace. The undersigned notes that the claimant does appear to have

motivation and self-esteem issues that limit him, but his activities of daily living appeared to be fairly routine, he assumes regular responsibilities in his home, interacts with his family and friends fairly normally, and he takes the responsibility to contributing to child care. . . .

. . . . [T]he opinion of the independent examiner is given little weight because of the inconsistencies set forth in detail above. Some of the findings, conclusions, and opinions offered by the independent examiner are consistent with the information in his examination. Those consistencies appear to support the findings and conclusions in this decision. However, without adequate informational or factual support other than the claimant's self-reports, the independent examiner then concluded that the claimant had several areas of marked limitation.

(Doc. 11, p. 129) A plain reading of the excerpts from Dr. Biblrey's report above at pp. 9-11 reveals the inconsistencies between Dr. Bilbrey's examination and his MSS, thereby supporting the ALJ's decision to give little weight to Dr. Bilbrey's opinion.

Plaintiff also details Dr. Jessee's mental RFC assessment in his second argument, but then fails to provide any factual allegations, reference to the record, or citation to relevant authority in support of this apparent argument. The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"). Consequently, this argument is waived. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Finally, plaintiff asserts in his third argument that Dr. Durvasula's opinion is "consistent with . . . [his] . . . hearing testimony." The record does not support this argument. For reasons previously

explained, Dr. Durvasula's clinical notes do not support plaintiff's testimony that he had not worked since October 31, 2008. Dr. Durvasula's clinical notes also are devoid of any reference to plaintiff's claim that he had crying spells, and that he was afraid of drive-thru windows, the end of the world, and multi-level buildings. As for thinking and memory, each and every one of Dr. Durvasula's clinical notes characterizes plaintiff's thinking as "Organized," and his memory as "Intact." As for his testimony that he had difficulty concentrating, plaintiff told Dr. Durvasula only once – on February 25, 2013 – that he "always had trouble concentrating." However, Dr. Durvasula never makes the direct observation that plaintiff has difficulty concentrating. On the other hand there is substantial evidence to the contrary. Mr. Killian noted that plaintiff "demonstrated more than adequate . . . concentration," Dr. Bilbrey twice noted that plaintiff did not appear to have any difficulty concentrating, and Mr. Herman noted that, although plaintiff "did have some difficulty with concentration . . . [it] . . . would not interfere with his ability to perform simple or detailed tasks . . . [and he did] . . . not see the concentration difficulty as a limiting factor."

As shown above, the ALJ gave good reasons for not giving Dr. Durvasula's MSS controlling weight, and his reasons were supported by substantial evidence on the record. Consequently, plaintiff's three-part first claim of error is without merit.

### 2. Whether the ALJ Erred in His Evaluation
### of Plaintiff's Obesity
### (Doc. 16, p. 23)

Plaintiff asserts that the ALJ "erred in failing submit a hypothetical to the vocational expert containing [his] restrictions as a result of the combination of his obesity with his emotional impairments and the restrictions related to his use of Coumadin." The transcript of the hearing shows that the ALJ asked the VE to "describe claimant's past work . . . ." (Doc. 11, p. 154) The ALJ did not ask the VE any other questions, nor was he "required to solicit testimony from [the] VE

in reaching his conclusion." *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010)(citing 20 C.F.R. § 404.1650(b)(2)("We may use the services of vocational experts . . . to help us determine whether you can do your past relevant work[.]")). Because the ALJ was not required to ask the VE the question at issue, plaintiff's second claim of error is without merit.

## IV. CONCLUSION
## AND
## RECOMMENDATION

For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 15) be **DENIED**, and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 31st day of August, 2016.


/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge